FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 23 2017 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
MARK SZUSZKIEWICZ,

                        Plaintiff,

      -against-

JPMORGAN CHASE BANK,

                        Defendant.
------------------------------------------------------------x

**MEMORANDUM AND ORDER**

12-cv-3793 (SLT) (VMS)

**TOWNES, United States District Judge,**

      Plaintiff Mark Szuszkiewicz brings this employment discrimination suit under the Americans with Disabilities Act against his former employer J.P. Morgan Securities LLC ("J.P. Morgan" or "Defendant"), successor to Chase Investment Services Corp., incorrectly named in the complaint as JPMorgan Chase Bank. The Court previously dismissed Plaintiff's hostile environment claims. Defendant now moves for summary judgment on Plaintiff's sole remaining claim for discriminatory discharge. (ECF Nos. 20, 45). For the following reasons, the motion is **GRANTED** and the case **DISMISSED**.

## LEGAL STANDARD

      Summary judgment is only appropriate where, considering "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). In determining whether there is a genuine issue of material fact, a court resolves all ambiguities and draws all justifiable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Where, as here, a pro se litigant is involved, although the same standards for dismissal apply, the Court must give a pro se litigant special latitude in responding to a summary judgment motion. *See McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (courts "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest possible arguments that they suggest'") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). In particular, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See McPherson,* 174 F.3d at 281.

In this case, Defendant provided Plaintiff with a "Notice to Pro Se Litigant" dated June 17, 2015, as required by Local Rule 56.2, which sets out the responsibilities of the pro se plaintiff in responding to a motion for summary judgment. The Notice advised Plaintiff of the procedures for responding to a motion for summary judgment, including the requirement that Plaintiff submit a response to Defendant's statement of facts pursuant to Local Rule 56.1 and to submit counter-evidence. Plaintiff demonstrated his understanding of the summary judgment procedure by submitting an affidavit and evidence in response to the motion.[1] With this standard in mind, the pertinent facts, undisputed, or where disputed considered in Plaintiff's favor, are as follows:

---

[1]Plaintiff has failed in many places to include citations to "evidence which would be admissible" in his "Response to Defendant's Rule 56.1 Statement" as required by Local Rule 56.1(d). (*See* ECF No. 46-5). However, because the Court has "broad discretion" to overlook noncompliance with local rules, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73-74 (2d Cir.2001), and in light of the Court's obligation to give pro se litigants latitude in responding to summary judgment motions, the court will deem Plaintiff's numbered responses as though asserted in a sworn declaration. Plaintiff submitted his statement of facts under a signed cover letter that "declare[d] under penalty of perjury" and "affirm[ed] that all the statements in [his] response to the defendant's 56.1 statement are true to the best of [his] knowledge." (ECF. No. 46). This effectively makes his responses, to the extent they are not conclusory or otherwise inappropriate for consideration, evidentiary in nature.

2

## BACKGROUND

### 1. J.P. Morgan Employment and Policies

Plaintiff began working as a Financial Advisor at J.P. Morgan in January of 2008. (Def.'s 56.1 Stmt. ¶¶ 1, 7.) Around the time of his hire, Plaintiff acknowledged his obligations under J.P. Morgan's "Criminal Convictions Policy" and "Harassment Free Workplace Policy." (Def.'s 56.1 Stmt. ¶¶ 7-14.) Specifically, he acknowledged that he was:

> [O]bligated to immediately inform JPMorgan Chase and update any information on this form including any [arrests], pending criminal cases, criminal convictions, guilty pleas, no contest pleas, and entry into pretrial diversions or similar programs concerning prosecution for a criminal offense, and that failure to do so may result in disqualification of my application, withdrawal of my offer, or termination of my employment whenever discovered.

(Def.'s 56.1 Stmt. ¶¶ 5-11). He also acknowledged that he was obligated to specifically inform a Human Resources Business Partner of any of these events and that his failure to do so could result in his termination. (Def.'s 56.1 Stmt. ¶¶ 10-11). Similarly, he acknowledged that J.P. Morgan's Harassment Policy prohibited harassment of bank employees or vendors and that violations of this policy could result in his immediate termination. (Def.'s 56.1 Stmt. ¶¶ 13-14.)

### 2. Mental Illness, Protective Order, Arrests and Convictions

In his capacity as Financial Advisor, Plaintiff interacted with various vendors, including one Norayama Gonzalez, who oversaw the wholesale of some of the financial products that Plaintiff sold to retail customers. (Def.'s 56.1 Stmt. ¶19). Although Plaintiff and Ms. Gonzalez had an amicable relationship at first, he was ultimately arrested for stalking her and for violating a protective order prohibiting further contact with her. (Def.'s 56.1 Stmt. ¶¶ 15-23; Pl.'s 56.1 Stmt ¶¶15-23).

Roughly half a year into his employment, Plaintiff suffered a psychotic break in or

around July of 2008 and stopped appearing at work. (Def.'s 56.1 Stmt. ¶ 20). According to his own testimony and complaint, he heard voices, frequently feared for his life due to "Nazis" and other unspecified threats, and otherwise suffered from severe and continuous delusions. (Compl. at 8-12; Pl.'s 56.1 Stmt ¶¶ 21-28). These delusions eventually caused a monomaniacal focus on Ms. Gonzalez and led Plaintiff to contact her as many as ten times a day, leave bizarre messages, and attempt to author a "masterpiece" poem that somehow involved Ms. Gonzalez and would miraculously "save the world." (*Id.*) Plaintiff's frequent messages and relentless efforts obviously frightened Ms. Gonzalez and ultimately led to his arrest for stalking on September 9, 2008.[2] (Def.'s 56.1 Stmt. ¶¶ 23-24). Still haunted by his delusions several weeks later, Plaintiff continued to contact Ms. Gonzalez and was arrested again on September 27 for violating a protective order and incarcerated for at least five more months. (Def.'s 56.1 Stmt. ¶¶ 28-32). In November, Plaintiff was indicted for aggravated harassment and criminal contempt in the first and second degree. (Def.'s 56.1 Stmt. ¶¶ 34-35). Several months later he pled guilty to the criminal contempt charges and received both a felony and misdemeanor conviction with the court's agreement to vacate his felony conviction upon his satisfaction of certain conditions, including psychiatric treatment and sobriety. (Def.'s 56.1 Stmt. ¶ 35). In March of 2010 he satisfied those conditions and the court vacated his felony conviction, but extended the protective order prohibiting Plaintiff from contacting Ms. Gonzalez for five additional years. (Def.'s 56.1 Stmt. ¶¶ 36-38).

---

[2] Plaintiff's many filings explain that his actions during this period resulted from frightening and overwhelming delusions and were not motivated by malevolent intent. In his self-conscious telling, he sought to protect Ms. Gonzalez, not to harm her. In any event, he acknowledges that his actions were fairly "perceived by her as harassment." (Pl.'s 56.1 Stmnt ¶ 29).

### 3. *Long Term Disability Leave, Efforts to Return to Active Employment and Termination*

Shortly after Plaintiff's breakdown in July of 2008, and pursuant to its "Disability Leave Policy," J.P. Morgan initially placed him on sick leave for one week, after which he received short-term disability benefits through January 29, 2009. (Def.'s 56.1 Stmt. ¶¶ 40-45). The Hartford, J.P. Morgan's disability insurer, later approved Plaintiff for long-term benefits. Those benefits expired two years later in January 2011. (Def.'s 56.1 Stmt. ¶ 45). At this point, after years of treatment, significant recuperation, and expiration of his disability benefits, Plaintiff informed J.P. Morgan that he "was ready to return to active employment" with his psychiatrist's approval. (Def.'s 56.1 Stmt. ¶¶ 60-61.) Pursuant to company policy, and because Plaintiff's position was no longer available, J.P. Morgan placed Plaintiff on a "60-day job search period" and required him to fill out a "Licensing and Registration Pre-Hire Background Notification Form and related Questionnaire" as a prerequisite to his return to active employment.[3] (Lieberman Decl., Ex. B; Def.'s 56.1 Stmt. ¶ 67). It is undisputed that in 2011, when responding to questions in that questionnaire, Plaintiff disclosed for the first time that he had been "charged with a felony." (Def.'s 56.1 Stmt. ¶67). It is also undisputed that Plaintiff has no memory of contacting a Human Resources Business Partner of any of the above arrests, indictments, convictions, or pleas as required by its Criminal Conviction Policy. (Pl.'s 56.1 Stmt. ¶¶ 25-33,

---

[3] Plaintiff disputes that his original job was no longer available. He contends that "although that's what [J.P. Morgan] says, I went online at the time and saw the exact position in Park Slope West Branch available. Also I interviewed in that branch and was told it was available . . . Proof of me interviewing at the Park Slope Branch is shown in plaintiff [sic] exhibit 2." (Pl.'s 56.1 Stmt. ¶64.) The court finds Plaintiff's assertion to have seen "the same position available" online without foundation and too conclusory to raise in issue of fact regarding the availability of his position after his absence for several years. Plaintiff's "exhibit 2," moreover, offers no proof of the availability of any position. Rather, it is a text message from Plaintiff's last supervisor stating only that he "[m]ay have you meet another (Dm) in park slope so call me." (ECF No. 46-2 at 1). This fact is, moreover, immaterial to resolution of this motion.

67).

It is nevertheless clear that at least two people at J.P. Morgan knew of Plaintiff's harassment, arrest, and incarceration in 2008, as Plaintiff emphasizes. Plaintiff's former supervisor, Seth Berkowitz, testified that Plaintiff called him in 2008 from Riker's Island and told him he had been arrested for violating a protective order. (Pl.'s 56.1 Stmt., Ex. 3 at 41:17-41:22). Further corroborating this point, Plaintiff points to The Hartford's "Summary Detail Report" concerning his disability insurance benefits, which recorded calls between the insurer and numerous parties involved in the disability insurance claims process. (*Id.* at Ex. 3). Specifically, the report reflects a call during which Plaintiff's psychiatrist advised that "he believes he was arrested on 8/27/08." (*Id.*). It also records a 2008 phone call from Nancy Castrogiavanni, a Human Resources Business Partner at J.P. Morgan, in which she "expressed concern [about a temporary claim denial] because [Plaintiff is] not on an approved leave and [J.P. Morgan] is considering termination." (*Id.*) During the same call, Castrogiavanni apparently advised that Plaintiff's coworkers were concerned that he would commit suicide, that one of Plaintiff's managers feared he would harm him, and that Plaintiff has been "arrested because he was harassing one of their vendors" and sending "disgusting text messages." (*Id.*). Despite his general contention that these facts establish that "they [J.P. Morgan] were aware of the harassment and arrests" in 2008, Plaintiff admits he has no memory of reporting his various arrests, indictments or convictions to a Human Resources Business Partner. (Kandel Decl., Ex. B, 226:5-12; Pl. 56 ¶ 27 ("It may be possible that I told an HR business partner and didn't remember . . .")).

In any event, after Plaintiff disclosed his felony charge when "applying" to rejoin "active employment," J.P. Morgan's Human Resources department solicited more information regarding

the charge and surrounding circumstances. In response, Plaintiff faxed the Certificate of Disposition from his criminal proceeding and included a letter explaining that he had since recovered from his delusions and providing greater context for the actions underlying his criminal proceedings. (Def.'s 56.1 Stmt. ¶ 70). The letter explained, among other things, that at the time of his arrest and conviction he had experienced "a psychological episode which consisted of severe paranoia, anxiety, depression, and delusions" and been "diagnosed with a mental illness that required medication and therapy to resolve." (¶71). This letter, according to Plaintiff, first notified J.P. Morgan of the mental disability it allegedly discriminated against and motivated his discharge.

In May, after Defendant requested and Plaintiff provided more information regarding his arrest and conviction, Kerri Phillips Bower, a Human Resources Business Partner, called Plaintiff to inquire about his relationship with Ms. Gonzalez. (¶¶80-83).

Finally, on June 8, Chase terminated Plaintiff's employment for stated reasons:

> In February 2011, [Plaintiff] disclosed . . . that he had been charged with a felony. Documents provided . . . revealed he was arrested on 09/09/2008 [for] Aggravated Harassment [and] and Criminal Contempt . . . The informant named in the court documentation was Norayama Gonzalez.
>
> Through internal investigation, Human Resources became aware that the informant was a vendor for Chase at the time of the events/arrest. When questioned [Plaintiff] stated to Human Resources that Norayama Gonzalez was a Wholesaler for Chase through Genworth and that was how they met. Mark stated their relationship was professional and he didn't know her that well.
>
> . . .
>
> [Plaintiff's] actions violated the Firm's Harassment-Free Workplace Policy. JPMorgan Chase is committed to maintaining a professional and collegial work environment in which all individuals are treated with respect and dignity. Accordingly, no form of harassment or

7

> inappropriate conduct is tolerated by or against employees, customers, vendors, contractors or any other individuals who conduct business with the firm.
>
> In addition, [Plaintiff] failed to report his arrest and conviction in a timely manner.

¶ 85.

### *4. EEOC Complaint and the Instant Lawsuit*

Soon after his termination, Plaintiff filed a charge with the Equal Employment Opportunity Commission regarding defendant's alleged discrimination on October 5, 2011, which stated:

> I am a male with a qualifying disability. I worked for [J.P. Morgan] from January 15, 2008 until my discharge on June 7, 2011. I have performed my duties satisfactorily. I believe that I was discriminated against by my employer based on my disability. Specifically, on June 7, 2011 I was discharged because my employer found out that I had civil charges in 2008 for harassing an affiliate employee and therefore violating [sic] company conduct policy. At the time of this incident my disability was the cause for my actions. I was terminated while I was on sick leave for my disability.

(ECF No. 15-2). Plaintiff received a Dismissal and Notice of Right to Sue letter on April 30, 2012. (Compl. at 14.) He then initiated this action, asserting claims for "hostile environment" and discriminatory discharge claims under the American's with Disabilities Act (the "ADA"), 42 U.S.C. § 12112 *et seq.* (*Id.* at 2-3). The Court previously dismissed Plaintiff's hostile environment claim, thus only his discriminatory discharge claim remains. (ECF No. 20 at 14).

### *5. Defendant's Motion for Summary Judgment*

Defendant moves for summary judgment dismissal of Plaintiff's remaining claim on the grounds that (1) he cannot establish that he is "disabled" as defined by the ADA and (2) he cannot establish that his termination was on account of his alleged disability. (ECF No. 45-35 at 1-3). Defendant also moves for summary judgment dismissal of Plaintiff's claim for $69,000,000 in damages, arguing that this or any other sum remains speculative and

unsubstantiated on the present record.

## DISCUSSION

As explained below, the court need not and does not address whether Plaintiff is "disabled" as defined by the ADA because J.P. Morgan is entitled to judgment as a matter of law in light of Plaintiff's failure to provide evidence that J.P. Morgan's reason for firing him was pretext for discrimination against his alleged disability.

### 1. *Applicable Legal Framework*

Plaintiff asserts a discriminatory discharge claim under Title I of the ADA, which provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

In order to withstand summary judgment on this claim, Plaintiff must establish an inference of discrimination under the three-tiered test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.2006). Under the first tier, Plaintiff is required to present a prima facie case of discrimination by showing that: (1) his employer is subject to the ADA; (2) Plaintiff suffers from a disability within the meaning of the ADA; (3) Plaintiff could perform the essential functions of his job with or without reasonable accommodation; and (4) Plaintiff was fired or otherwise discriminated against because of his disability. *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144, 149 (2d Cir.1998). Once established, the prima facie case gives rise to an inference of discrimination because "'we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible [discriminatory] factors.'" *Texas*

*Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 (1981) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)). In effect, establishment of the prima facie case "creates a presumption that the employer unlawfully discriminated against the employee." *Id.*

As a consequence of this presumption, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employee's discharge. *McDonnell Douglas Corp.*, 411 U.S. at 802. At this stage, the employer need only articulate—but need not prove—the existence of a nondiscriminatory reason for its decision. *Burdine*, 450 U.S. at 254–56. The defendant satisfies this burden if the reason given, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Id.* at 255. Thus, once a defendant produces some evidence of legitimate reason for its employment act, the presumption of discrimination evaporates and the burden shifts to the plaintiff.

Under the third tier of the *McDonnell Douglas* test, a plaintiff bears the ultimate burden of proving that the reason proffered by the employer is a pretext for unlawful discrimination. *St. Mary's Honor*, 509 U.S. at 516–18, (1993) ("inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced"). In order to survive a motion for summary judgment, Plaintiff must "establish a genuine issue of material fact ... as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Services, Ltd.*, 22 F.3d 1219, 1225 (2d Cir.1994). To meet this burden, plaintiffs must do more than show

that the employer's reason is false. *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). Plaintiffs must also, at the very least, "point to evidence that reasonably supports a finding of prohibited discrimination." *Id.*

## 2. Analysis

Here, assuming but not deciding that Plaintiff has established a prima facie case, the court concludes that he has nevertheless failed to meet his burden under the third tier of the *McDonnell Douglas* test. J.P. Morgan has articulated and supported with ample evidence several reasons for discharging Plaintiff. Namely, J.P. Morgan has produced evidence that Plaintiff violated two policies, both of which Plaintiff acknowledged in writing at the outset of his employment and in subsequent testimony. (Def.'s 56.1 Stmt. ¶¶ 5-14). The company's "Criminal Convictions Policy" obligated him to "immediately inform" a Human Resources Business Partner of any arrests, criminal cases, convictions, guilty pleas, and "entry into pretrial diversions or similar programs concerning prosecution for a criminal offense" and that failure to do so could result in his termination. (Def.'s 56.1 Stmt. ¶¶ 10-11). The company's "Harassment Free Workplace Policy" prohibited him from harassing bank employees or vendors and that violation of this policy could result in his immediate termination. (Def.'s 56.1 Stmt.¶¶ 21-14.) Plaintiff's lengthy, unreported criminal record of harassing Ms. Gonzalez clearly establishes his violation of both of those policies. With this showing, J.P. Morgan has more than met its burden to articulate a legitimate reason for terminating Plaintiff's employment.

Read liberally, Plaintiff appears to make two distinct arguments in contending that J.P. Morgan discharged him "because of" his mental disability.[4] First, he appears to argue that the

---

[4] Plaintiff alternately describes his disability as "mental disability," "schizophrenia," and "bi-polar disorder." (*see, e.g.*, Pl.'s 56.1 Stmt. ¶ 89; Compl. at 12; Pl.'s Br. at 2.) For the purposes

11

ADA prohibits punishment for conduct caused by one's disability. That is, he argues that because his mental illness caused his conduct, any punishment of that conduct would *per se* punish him for being mentally ill and therefore discriminate against him "because of" that disability. In this respect he contends that he "was discharged because [his] employer found out that [he] had civil charges in 2008 for harassing an affiliate employee and therefore violating company conduct policy. At the time of this incident [his] disability was the cause for [his] actions." (ECF No. 15-2.). Second, he argues that J.P. Morgan's delay in firing him until the time he notified the company of his diagnosis with "mental illness" establishes pretext. In this regard, he argues that because "others in the company knew since 2008 as proven [by the Hartford call log] and this is all once again a pretext for the real reason for my termination which is the fact that I had a mental disability." (Pl.'s 56.1 Stmt. ¶ 83). Neither argument finds support from law or evidence.

Plaintiff's first argument is essentially that conduct caused by his mental disability cannot provide a legitimate reason for his discharge. This argument misunderstands and profoundly overstates the scope of the ADA's protections. As Justice Sotomayor has explained, that a disabled plaintiff's "misconduct was a manifestation of his disability is immaterial because the ADA does not immunize [him] from discipline or discharge for incidents of misconduct in the workplace." *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 289 (S.D.N.Y. 1999), aff'd, 205 F.3d 1327 (2d Cir. 2000). Plaintiff's egregiously harassing conduct provided J.P. Morgan with a legitimate reason to fire him even though his delusions may have caused his conduct. *See McElwee v. Cty. of Orange*, 700 F.3d 635, 644 (2d Cir. 2012) ("This inappropriate behavior is

---

of this motion the Court construed his allegation broadly and has reviewed the evidence for evidence of discrimination against mental disability of any kind.

indisputably a legitimate non-discriminatory reason for dismissing [Plaintiff] from the volunteer program, even if the behavior resulted from his disability."); *Palmer v. Circuit Court of Cook County, Ill.*, 117 F.3d 351, 352 (7th Cir.1997) (holding that "if an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the [ADA]"); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 n. 3 (4th Cir.1997) (holding that "misconduct—even misconduct related to a disability—is not itself a disability, and an employer is free to fire an employee on that basis"); *Johnson v. Maynard*, No. 01 CIV. 7393 (AKH), 2003 WL 548754, at *5 (S.D.N.Y. Feb. 25, 2003) ("When an employer fires an employee because of that employee's unacceptable behavior, the fact that that behavior was precipitated by mental illness does not present an issue under the ADA.")

Plaintiff's second argument, that his discharge was pretext, also fails to raise a genuine issue of material fact for trial. Plaintiff contends that pretext is shown by J.P. Morgan's delay in terminating his employment until after learning of his formal diagnosis in 2011. It was only after the company learned of his diagnosis, according to this theory, that it realized Plaintiff was disabled and on that basis decided to fire him. Prior to discovering his diagnoses, J.P. Morgan excused Plaintiff's conduct and refrained from terminating him during his long-term disability leave because he was a "top earner" from whom the company would profit again at some unknown point in the future. (*See* Pl.'s 56.1 Stmt. ¶ 88 (J.P. Morgan was "aware of the harassment and arrests and decided not to terminate me because I was a top producer.")); *id.* ("it wasn't until after my [2011] letter explaining the details of my disability (including delusional thought's [sic]) that they decided to terminate me because of my mental disability")). To establish that J.P. Morgan knew of his arrest and harassment, Plaintiff cites to the testimony of

Seth Berkowitz, who served as his supervisor in 2008 and testified that Plaintiff had called him and told him that he was "arrested for violation of a protective order and . . . in Rikers Island." (ECF No. 46-3 , 41:17-41: 22). Plaintiff also cites to the Hartford call log for the proposition that "a human resources business manager by the name Nancy Castrogiavanni was well aware of all the details of my arrest and [harassment of Ms. Gonzalez]." (Pl.'s 56.1 Stmt. ¶25). The relevant portion of that call log records Castrogiavanni as stating that Plaintiff had been "arrested because he was harassing one of their vendors, he was sending disgusting text messages, harassing vendor [Gonzalez]." (Pl.'s Ex. 3, ECF No. 46-3 at 1.)

This argument falls short of establishing pretext for several reasons. First off, it ignores that the company's Criminal Convictions Policy obligated him to report *each* of his several arrests, indictments, pleas, and convictions to a "Human Resources Business Partner." Neither Berkowitz's testimony nor The Hartford's call log establish that he satisfied this obligation. Rather, Berkowtiz's testimony establishes only that he reported one of several arrests to a supervisor, rather than human resources, and says nothing of his obligation to report his subsequent pleas and convictions. Similarly, that Castrogiavanni knew in 2008 that he had been "arrested because he was harassing one of their vendors" does not establish that Plaintiff reported his arrest to her directly. At most it establishes that she knew of one of his several arrests and, again, says nothing of his subsequent pleas and convictions. Indeed, Plaintiff offers no evidence that he reported *any* of his arrests or convictions to a Human Resources Business Manager. To the contrary, he simply asserts that "[i]t may be possible that I told an HR business partner and didn't remember considering she knew a lot of details." (Pl.'s 56.1 Stmt. ¶ 25). And, of course, that either Berkowitz or Castrogiavanni knew of his harassment in no way excuses his conduct or somehow contradicts that he violated the Company's Harassment Policy.

Moreover, Plaintiff has not produced evidence supporting his theory that J.P. Morgan excused his behavior and delayed his discharge because he was a "top producer." To establish that he was a top producer, Plaintiff cites to three emails and inapposite testimony of a manager, Mr. Wilson. The emails disclose only that (i) a supervisor considered his performance through February of 2008 as "[n]ot bad for a 1st month in new Builds [sic]," (ii) that his sales performance in March was third best out of eleven local financial managers and ranked 79th for the month on a broader regional scale, and (iii) that his performance through June 20 was seventh best out of eighteen. ((ECF No. 46-1, Pl.'s Ex. 1, at 1-4). Mr. Wilson's testimony states only that Plaintiff's sales "production was average." (*Id.* at 5). No reasonable juror could infer from these facts that Plaintiff was a "top producer," let alone that they show a performance for which any reasonable employer would excuse Plaintiff's conduct.

Because Plaintiff's evidence offers no support for his theory, he at best asserts an argument based on the temporal proximity between his discharge and his March 2011 letter explaining that he had been "diagnosed with a mental illness that required medication and therapy to resolve." (¶71). No reasonable juror could conclude that this proximity establishes a discriminatory discharge. As Plaintiff emphasizes, the company had knowledge in 2008 of his delusions, including his belief that he was being "chased by Nazis" (Pl.'s 56.1 Stmnt ¶¶ 21-28). The Company also knew he was on disability leave for a matter of years. With this information the company had sufficient notice of his mental illness long before his 2011 letter. Simply put, learning of his formal diagnosis gave the company no more reason to conclude that Plaintiff had been mentally ill. Any proximity argument therefore fails.

Viewing the instant record in the light most favorable to Plaintiff, no rational jury could find J.P. Morgan's reasons for his termination constituted pretext. Plaintiff has no doubt suffered

15

extreme hardship due to his disability. The court commends him for his recovery and fortitude, but the undisputed facts make clear that the ADA offers him no legal recourse against J.P. Morgan.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment is **GRANTED** and the action is hereby **DISMISSED.** The Clerk of Court is directed to close the case.

**SO ORDERED.**

/s/ *Sandra L. Townes*
SANDRA L. TOWNES
United States District Judge

Brooklyn, New York
Dated: June 22, 2017